IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RICHARD HIGHTOWER,**<br><br>    Plaintiff,<br><br>    *v.*<br><br>**CITY OF PHILADELPHIA, et al.,**<br><br>    Defendants. | **CIVIL ACTION**<br><br>**NO. 21-4075-KSM** |

### MEMORANDUM

**MARSTON, J.**                                                                                             **April 14, 2022**

Tragically, Plaintiff Richard Hightower was violently attacked by his cellmate while incarcerated at Curran-Fromhold Correctional Facility ("CFCF"). Hightower suffered severe and permanent injuries and was rendered a quadriplegic. (Doc. No. 22.) Hightower brings this action against Defendants City of Philadelphia (the "City"), Warden John Delaney, Sergeant Shantel Major, Corizon Health, Inc., and Nurse Danielle McGettigan (collectively, "Defendants"), under 42 U.S.C. § 1983. (*Id.*) Hightower alleges that, by housing him with a violent inmate and failing to intervene after his cellmate threatened to kill him, Defendants failed to protect him, acted with deliberate indifference to his safety, and violated his Eighth and Fourteenth Amendment rights. (*Id.*)

The City moves to dismiss, arguing that Hightower has failed to show that the City can be held liable under *Monell v. New York City Department of Social Services*, 436 U.S. 658, 694 (1978) because he has not alleged that his constitutional rights were violated by a City practice, policy, or custom. (Doc. No. 23 at 8–10.) The City also argues that Hightower's *Monell* claim must be dismissed to the extent it is premised on the City's failure to train its employees because

Hightower does not allege prior instances of misconduct or a pattern of behavior by the City's untrained employees. (*Id.* at 10.) Hightower opposes the motion. (Doc. No. 24.)

For the reasons discussed below, we deny the City's motion.

**I.      Factual Background**

Accepting Plaintiff's allegations as true, the relevant facts are as follows.

*A.  Hightower Arrives at CFCF*

On September 13, 2019, Hightower, a 58-year-old male,[1] arrived at CFCF, where he was held on non-violent charges. (Doc. No. 22 at ¶ 66.) Hightower was housed in an intake unit, Unit B1, Pod 4, and was assigned to Cell 21, Bed 3. (*Id.* at ¶¶ 67, 76, 78.)

*B.  Tyler Arrives at CFCF and Is Transferred Shortly Thereafter*

The month prior, on August 19, Anthony Tyler, a 25-year-old male,[2] entered CFCF, where he was held on violent charges, including aggravated assault, criminal trespass, terroristic threats, recklessly endangering another person, burglary, possessing an instrument of crime, simple assault, and criminal mischief. (*Id.* at ¶ 68.) At the time of his arrival, Tyler had "multiple stab wounds to his body." (*Id.* at ¶ 69.)

That same day, Tyler was transferred to the Detention Center ("DC") and admitted to the infirmary for medical treatment of his stab wounds. (*Id.* at ¶ 70.) Two days later, on August 21, a nurse medically cleared Tyler of tuberculosis and the DC Infirmary/Public Health Services Wing ("PHSW") medically cleared Tyler for housing. (*Id.* at ¶ 71.)

---

[1] Hightower was 5 feet, 9 inches tall and weighed approximately 165 pounds at the time. (*Id.* at ¶ 93.)

[2] Tyler was 6 feet tall and weighed approximately 182 pounds at the time. (*Id.* at ¶ 94.)

### C. *Tyler Returns to CFCF and Is Housed With Hightower, Notwithstanding His Violent Tendencies and History of Institutional Violence*

The next month, on September 13, the same day Hightower arrived, Tyler returned to CFCF, at which point he was evaluated by Nurse McGettigan and "improperly placed back on the intake unit." (*Id.* at ¶¶ 72–73; *see also id.* at ¶ 76 ("Because Inmate Tyler was classified on August 21, 2019 at DC PHSW, he should not have been housed in intake upon his return to CFCF."); *id.* at ¶ 78 ("Tyler was angry for being improperly placed back in an intake unit.").)[3]

The following evening, on September 14 around 5:40 p.m., Tyler was assigned to Bed 1 in Hightower's cell, Cell 21. (*Id.* at ¶ 77.) CFCF made this assignment notwithstanding Tyler's "history of violent behavior and of violence against other inmates and staff" and the fact that Tyler "suffered from serious mental health illness." (*Id.* at ¶ 62; *see also id.* at ¶ 96; *id.* at ¶ 109 ("At all times, it was known by the Defendants that Anthony Tyler was a violent offender, with a violent criminal history, a history of institutional violence, and severe mental health illness.").) Tyler was on the "behavioral health caseload" and "was listed as having 'SMI' (Serious Mental Illness)." (*Id.* at ¶ 95.) In addition, when incarcerated in the past, Tyler had been involved in fights and had acted violently and/or threatened violence towards staff members and other inmates within City-operated prison facilities.[4] (*See id.* at ¶ 98 (describing an October 19, 2016

---

[3] Hightower alleges that upon Tyler's return to CFCF, the correctional staff also incorrectly handled the requisite medical clearances and intake screenings. (*See id.* at ¶ 74 ("Upon information and belief, when Inmate Tyler returned to CFCF, the correctional staff did not receive a medical clearance confirmation per protocol."); *id.* at ¶ 75 ("Upon Inmate Tyler's return to CFCF, neither the time keeping officer nor the receiving room nor any other CFCF staff members contacted the triage nurse or any staff members at DC PHSW to see if Inmate Tyler had his intake screening completed and to learn if he was medically cleared before being housed.").)

[4] The Court takes judicial notice of Tyler's First Judicial District of Pennsylvania criminal docket, which is a matter of public record. *See Big Red Mgmt. Corp. v. Zurich Am. Ins. Co.*, --- F. Supp. 3d --- , Civil Action No. 20-2113-KSM, 2022 WL 79623, at *2 n.1 (E.D. Pa. Jan. 7, 2022) ("On a motion to dismiss, courts may take judicial notice of matters of public record."); *Lapensohn v. Hudson City Savings Bank*, Civil Action No. 19-4576-KSM, 2021 WL 1581402, at *1 n.3 (E.D. Pa. Apr. 21, 2021) ("In evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint, and

institutional fighting charge against Tyler, which arose "in connection with an incident in which he was fighting with another inmate while returning to his housing area."); *id.* at ¶ 100 (detailing a June 7, 2017 institutional charge Tyler received for "disturbing other inmates or staff, refu[sing] to comply with a valid order, and threatening harm, in connection with an incident in which he was screaming, banging on his bed, and kicking the walls"); *id.* at ¶ 101 (noting that on July 7, 2017, Tyler was "charged institutionally with fighting, and disturbing other inmates or staff" because he got into a fight with another inmate, during which "both inmates were injured"); *id.* at ¶ 104 (explaining that on September 27, 2017, Tyler received an institutional charge "in connection with an incident in which he was fighting with another inmate and banging on the gate of a cell"); *id.* at ¶ 105 (noting that on October 9, 2017, Tyler "was again charged institutionally with fighting in connection with an incident in which he was violently beating his cellmate").)

Further, Tyler had committed other violent crimes and made threats of violence outside of the institutional setting. (*See id.* at ¶ 99 (stating that on May 2, 2017, Tyler was arrested and charged with, among other things, "Terroristic Threats with Intent to Terrorize Another and Stalking – Repeatedly Commit Acts to Cause Fear," and that on July 20, 2017, he pleaded guilty to the former charge); *id.* at ¶ 99 (noting that on August 18, 2019, Tyler was arrested and charged with aggravated assault and simple assault, among other things).) During his prior incarcerations, Tyler had been placed in segregated housing to protect other inmates given his

---

any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case." (quoting *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006)); *see also Coyle v. Talbert*, Criminal Action No. 20-CR-195-KSM, 2020 WL 3960431, at *1 n.1 (E.D. Pa. July 13, 2020) (taking judicial notice of state court criminal docket because it is a matter of public record). This docket shows that Tyler's prior arrests, including those detailed in the amended complaint involving violence, occurred in Philadelphia County and as such Tyler would have been housed within prison and correctional facilities operated by the City.

violence tendencies. (*Id.* at ¶ 108 ("Throughout Inmate Tyler's various incarcerations, his violent conduct caused him to be placed in segregated housing to keep him from harming other inmates.").)

### D. Tyler Begins to Act Out and Ultimately Assaults Hightower

After he was placed in Cell 21 with Hightower on September 14, Tyler "began to act out" and threatened to harm Hightower. (*Id.* at ¶ 79.) Then, on the evening of September 15, Tyler "bang[ed] on the door to Cell 21 and scream[ed] out," making "threats of violence" against Hightower. (*Id.* at ¶ 80.)

At some point, Sergeant Major, who was assigned to the 3:00 p.m. to 11:00 p.m. shift covering their unit and pod, went to their cell. (*Id.* at ¶ 81.) Tyler complained to Sergeant Major that his cell and "cellee" (i.e., Hightower) were "dirty" and demanded to be moved from that cell. (*Id.* at ¶ 82.) Sergeant Major denied Tyler's request and informed "him that no cell changes would be made until the 7 [a.m.] to 3 [p.m.] shift." (*Id.* at ¶ 83.) "Tyler responded that if he could not get out of his cell then he would kill his cellmate, [Hightower]." (*Id.* at ¶ 84.) Notwithstanding Tyler's menacing threats to kill Hightower, Sergeant Major did nothing. (*Id.* at ¶¶ 85–86.)

Later that evening, Hightower fell asleep on the top bunk. (*See id.* at ¶ 87.) Tyler grabbed Hightower off the top bunk, pulled him to the cement floor, and "proceeded to brutally punch and kick [Hightower] [in] the face, upper body, and chest." (*Id.*) After the vicious attack, Sergeant Major entered their cell and pepper sprayed Tyler in the face. (*Id.* at ¶ 88.) However, Sergeant Major left the cell when Tyler "came toward her." (*Id.*)

Afterwards, once the responding officers arrived, Tyler was handcuffed[5] and taken to the

---

[5] As a result of the incident, Tyler was charged "with assault non-staff w/ injuries, assault on inmate by inmate, disrespecting any staff member, disturbing other inmates or staff, fighting if injury results/weapon

5

medical unit, while Hightower was transported from his cell to Jefferson Torresdale Hospital. (*Id.* at ¶¶ 89–90.) Later, Hightower was airlifted to Thomas Jefferson University Hospital due to the severity of his injuries. (*Id.* at ¶ 90.) Doctors worked to treat Hightower's injuries, but Tyler's attack left Hightower paralyzed. (*Id.* at ¶ 91.)

## II.     Legal Standard

In deciding a motion to dismiss under Rule 12(b)(6), the court must determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although we must accept as true the allegations in the complaint, we are not "compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quotation marks omitted). In other words, a "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (cleaned up). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*

## III.    Discussion

Hightower brings claims under 42 U.S.C. § 1983, asserting that Defendants violated his rights under the Eighth and Fourteenth Amendments. Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights,

---

used, refusal to comply with a valid order, and violating any other posted rule or reg[ulation]." (*Id.* at ¶ 93.) He was found guilty of all charges. (*Id.*)

>privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.  Local governments and municipalities are considered persons under § 1983. *Monell*, 436 U.S. at 690.  A governmental entity, however, "may not be held liable for constitutional torts under § 1983 on a vicarious liability theory rooted in *respondeat superior*." *Mulholland v. County of Berks*, 706 F.3d 227, 237 (3d Cir. 2013).  There are two different ways for a § 1983 claim against a municipality to proceed:  "a plaintiff may allege a constitutional violation caused by the municipal defendant's 'official policies and customs,'" or a plaintiff may "allege municipal liability through a 'failure-or-inadequacy' claim." *Benson v. Delaware County*, Civil Action No. 21-2854, 2022 WL 784475, at *3 (E.D. Pa. Mar. 15, 2022) (cleaned up); *see also Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019).

Here, the City argues that Hightower's § 1983 claim against it must be dismissed because Hightower has failed to allege sufficient facts to proceed under either theory.  (Doc. No. 23.)  We address each theory in turn, as the "avenues" for stating the two types of *Monell* claims are "distinct."  *See Forrest*, 930 F.3d at 106 ("Although we have acknowledged the close relationship between policy-and-custom claims and failure-or-inadequacy claims, the avenues remain distinct:  a plaintiff alleging that a policy or custom led to his or her injuries must be referring to an unconstitutional policy or custom, and a plaintiff alleging failure-to-supervise, train, or discipline must show that said failure amounts to deliberate indifference to the constitutional rights of those affected."); *see also Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) ("The pleading requirements are different for failure-to-train claims because a plaintiff need not allege an unconstitutional policy.").

7

### A. Policy-or-Custom Claim

1. <u>Relevant Law</u>

To proceed with a policy-or-custom claim, a plaintiff must plead that there is "an unconstitutional municipal policy or custom." *Forrest*, 930 F.3d at 105. The plaintiff must "identify the challenged policy, attribute it to the city itself, and show a causal link between execution of the policy and the injury suffered." *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984). "Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Mulholland*, 706 F.3d at 237 (cleaned up); *see also Forrest*, 930 F.3d at 105 ("[A] plaintiff presenting an unconstitutional policy must point to the official proclamation, policy or edict by a decisionmaker possessing final authority to establish municipal policy on the relevant subject."). And a "course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials are so permanent and well-settled as to virtually constitute law." *Mulholland*, 706 F.3d at 237 (cleaned up); *see also Forrest*, 930 F.3d at 105–06 ("[I]f alleging a custom, the plaintiff must evince a course of conduct so well-settled and permanent as to virtually constitute law."). "To show causation, [the plaintiff] may allege a municipal Defendant was aware of similar unlawful conduct in the past, but failed to take precautions against future violations and this failure, at least in part, led to the injuries in question." *Benson*, 2022 WL 784475, at *3; *see also Estate of Roman*, 914 F.3d at 798 (same).

2. <u>Hightower's Allegations</u>

In his amended complaint, Hightower alleges that the City maintained a litany of policies, practices, or customs related to its housing, placement, and classification that resulted in the violation of his constitutional rights. (*See generally* Doc. No. 22.) Hightower pleads, *inter alia*, that the City had the following customs or practices: "placing and/or housing violent offenders

8

in cells with other inmates" (*id.* at ¶ 24; *see also id.* at ¶¶ 26, 29); "placing and/or housing violent offenders in cells with non-violent inmates" (*id.* at ¶ 25); "placing and/or housing inmates with a history of violence against other inmates and/or prison staff in cells with other inmates" (*id.* at ¶ 27); "placing and/or housing inmates with severe mental health illness in cells with other inmates" (*id.* at ¶ 28); "ignoring threats of harm made by inmates against other inmates" (*id.* at ¶ 30); "failing to timely respond to threats of harm made by inmates against other inmates" (*id.* at ¶ 31); "failing to immediately remove an inmate from a cell when the inmate is threatening to commit violence against his cellmate" (*id.* at ¶ 32); "failing to adhere to classification protocols related to inmate housing to ensure the safety of other inmates" (*id.* at ¶ 34); and "failing to identify and respond to the improper placement and/or housing of inmates with violent tendencies and/or a history of violence and/or mental illness" (*id.* at ¶ 36).

3. Analysis

Viewing the facts in the light most favorable to Hightower, the Court finds that Hightower has sufficiently alleged that the City maintained a custom or policy that violated his constitutional rights.[6]

*Williams v. Delaware County Board of Prison Inspectors* involves somewhat similar facts and is instructive. Civil Action No. 17-4348, 2018 WL 4558190 (E.D. Pa. Sept. 20, 2018). In that case, the plaintiff asserted a *Monell* claim, alleging that the defendants—the County, the Board of Prisons, and Community Education Centers, Inc. ("CEC")—maintained a policy or

---

[6] The City does not appear to dispute that Hightower has a constitutional right to be free from inmate violence. (*See generally* Doc. No. 23.) Although Hightower does not specifically plead that he was a pretrial detainee, it appears as if that was the case from the fact that he entered CFCF on charges shortly before he was attacked, in which case his constitutional rights arise under the Fourteenth Amendment. *See Benson*, 2022 WL 784475, at *2 ("As he was a pretrial detainee at the time of the alleged attack, the claims arise under the Fourteenth Amendment's Due Process Clause. It provides protections at least as great as the Eighth Amendment protections available to a convicted prisoner." (cleaned up)).

9

custom of housing pre-trial detainees with violence-prone inmates, and that the Prison Board and CEC failed to protect him. *Id.* at \*1, \*11. In particular, the plaintiff alleged "CEC and the Prison Board violated his Fifth, Eighth, and Fourteenth Amendment rights to be free from inmate violence; the Prison Board and CEC have a policy or custom of holding pre-trial 'protective custody' detainees with violent prone inmates depriving him of his constitutional rights; [and] the Prison Board and CEC knew [the plaintiff's] status as a protective custody detainee and knew of violent prone inmates but nonetheless 'mixed him in' with violent prone inmates with deliberate indifference." *Id.* at \*12. Noting that the plaintiff had a "clearly established constitutional right to have prison officials protect him from inmate violence," the court held that the plaintiff's allegations were sufficient and denied the defendants' motion to dismiss his *Monell* claim. *Id.* ("At the pleading stage, [the plaintiff] plausibly alleges a policy or custom of housing pre-trial protective custody detainees with violent prone inmates in violation of his constitutional right to be free from inmate violence.").

So too here. Hightower has identified a number of customs and practices, such as housing inmates with a history of violence or severe mental health illness in cells with other inmates (*see* Doc. No. 22 at ¶¶ 24–34, 36), which he alleges resulted in improper placements that allowed Tyler to attack him (*see id.* at ¶¶ 40, 45, 52). Hightower has also alleged that Tyler had a history of violent behavior against other inmates and prison staff; Hightower specifically alleges other instances of institutional violence by Tyler that occurred at other City-operated correctional facilities,[7] separate and apart from the violent incident involving Hightower. (*Id.* at ¶¶ 98, 100–01, 105–06.) *See Benson*, 2022 WL 784475, at \*3 ("To show causation, [the plaintiff] may allege a municipal Defendant was aware of similar unlawful conduct in the past,

---

[7] *See supra* n.4.

but failed to take precautions against future violations and this failure, at least in part, led to the injuries in question."); *see also Estate of Roman*, 914 F.3d at 798 (same).  The Court finds that these allegations are sufficient to withstand a motion to dismiss.  *See Williams*, 2018 WL 4558190.

Because Hightower has plausibly alleged a specific policy or custom violated his right to be free from inmate violence, the Court denies the City's motion to dismiss the policy-or-custom *Monell* claim.

### B.  Failure-or-Inadequacy Claim

#### 1.  Relevant Law

"A claim predicated on a failure or inadequacy is subject to the 'separate, but equally demanding requirement of demonstrating' the alleged failure or inadequacy amounts to 'deliberate indifference.'"  *Benson*, 2022 WL 784475, at *4 (quoting *Forrest*, 930 F.3d at 106); *see also Wood v. Williams*, 568 F. App'x 100, 105 (3d Cir. 2014) ("Failure to train can be the basis of *Monell* liability when the municipality's 'failure to train reflects deliberate indifference to constitutional rights.'" (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989))).  "Additionally, the identified deficiency in a city's training program must be closely related to the ultimate injury; or in other words, the deficiency in training must have actually caused the constitutional violation."  *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014) (cleaned up).

To state a failure-or-inadequacy claim, a plaintiff must allege that (1) municipal policymakers knew that employees would confront a particular situation, (2) the situation involved a difficult choice or there was a history of employees mishandling the situation, and (3) an employee making the wrong choice would frequently cause deprivation of constitutional rights.  *Forrest*, 930 F.3d at 106; *Estate of Roman*, 914 F.3d at 798.

11

"Ordinarily, a pattern of similar constitutional violations by untrained employees is necessary to demonstrate deliberate indifference for purposes of failure to train." *Thomas*, 749 F.3d at 223 (cleaned up); *see also Connick v. Thompson*, 563 U.S. 51, 62 (2011) ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."). However, "a single incident may be enough where it is 'so obvious' the specific failure will result in a constitutional violation." *Benson*, 2022 WL 784475, at *4 (cleaned up); *see also Canton*, 489 U.S. at 390 n.10 (explaining that when a city arms its police officers with firearms, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be so obvious that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights"); *Thomas*, 749 F.3d at 223. *Contra Connick*, 563 U.S. at 63–64 (holding that failure to train prosecutors on their *Brady* obligations did not fall within the "narrow range of . . . single-incident liability" since lawyers, as opposed to the average public employee, already have legal training).

### 2. Hightower's Allegations

Here, Hightower alleges that the City "failed to properly train, supervise, and/or monitor correctional officers and supervisors" on the "the appropriate placement and/or housing of inmates with violent tendencies and/or a history of violence and/or mental health illness such as inmate Tyler" (Doc. No. 22 at ¶ 152; *see also id.* at ¶ 155) and how "to identify, prevent, and intervene in assaultive conduct" (*id.* at ¶ 153).[8]

---

[8] *Estate of Roman*, 914 F.3d at 799 n.7 ("We consider allegations of failure to train, supervise, and discipline together because they fall under the same species of municipal liability.").

3. <u>Analysis</u>

Viewing the facts in the light most favorable to Hightower, the Court finds that Hightower has pleaded sufficient facts to support a failure-or-inadequacy train claim based on a pattern of similar constitutional violations by untrained employees. Hightower alleges that the City owns, operates, maintains, and is responsible for its prison and correctional facilities including CFCF. (Doc. No. 22 at ¶ 6.) Hightower alleges the City was aware of Tyler's history of institutional violence because he engaged in multiple other incidents of violence while housed in the City's prisons and correctional facilities.[9] (*Id.* at ¶¶ 98, 100–01, 105–06.) Taking these allegations together, Hightower has alleged that the City's prison and correctional facility employees have encountered other instances of inmate-on-inmate violence within the Philadelphia prison system sufficient to plead the requisite pattern of constitutional violations needed to establish deliberate indifference for his failure to train claim. Accordingly, the Court denies the City's motion to dismiss Hightower's failure to train claim to the extent it is based on this theory.

The Court also concludes that Hightower has stated a failure-or-inadequacy claim based on a single incident. On a motion to dismiss, the defendant bears the burden of showing that the plaintiff's complaint fails to state a claim, and the City has not done so here; rather, the City focused exclusively on Hightower's failure to plead facts showing a pattern of constitutional violations and never addressed the single incident theory. (*See* Doc. No. at 10.) *See Ford v. County of Mercer*, Civil Action No. 14-0648(FLW), 2016 WL 781877, at *9 (D.N.J. Feb. 29, 2016) ("The Court also declines to dismiss the *Monell* claim based on failure to train because the County Defendants have not carried their burden to show that Plaintiffs fail to state a claim for

---

[9] *See supra* n.4.

13

relief based on . . . a single incident theory of liability. In [their] reply brief, the County Defendants argue that *Connick* does not permit a failure to train based on the 'single incident' of housing Defendant Gaines and Boones together, and that *Connick* permits 'single incident' failure to train claims only in situations where the failure to train is 'patently obvious,' but provide no further analysis of the facts alleged in the Amended Complaint. As such, they have failed to meet their 'burden of showing that no claim has been presented.'" (citations omitted)).

Here, drawing all inferences in Hightower's favor, the Court finds that Hightower has pleaded facts to state a failure to train claim based on a single incident.

*Reynolds v. Municipality of Norristown* is instructive. There, the plaintiff was involved in a car accident, and the police officers who arrived at the scene found the plaintiff showing signs of a head injury—he was "confused, disoriented, and unable to stand, walk, or respond to the officers' questions." Civil Action No. 15–0016, 2015 WL 4450979, at *2 (E.D. Pa. July 17, 2017). The officers arrested the plaintiff for driving under the influence (even though there was no evidence of alcohol or a controlled substance), transported him to the detention facility, and threw him into a holding cell. *Id.* Many hours later, the plaintiff was finally transported to a hospital, and medical professionals discovered hemorrhaging in his brain. *Id.* at *3. The plaintiff asserted a failure to train claim against the municipality, alleging that the police officers were not trained to differentiate a head injury from drug or alcohol use in car accident victims and that when there is no detectable sign of alcohol or drug use, police officers should first transport accident victims to a hospital to be evaluated for medical conditions. *Id.* at *11.

The court denied the municipal defendant's motion to dismiss the failure-or-inadequacy claim, holding that although the plaintiff did not state a claim based on a similar pattern of constitutional violations, he did state a claim based on the single incident theory. *Id.* at *12. The

14

court reasoned that the municipality "know[s] to a moral certainty that their police officers will be required to respond to incidents in which persons who come into their custody have suffered serious, and sometimes life-threatening, injuries" and that under the due process clause of the Fourteenth Amendment, police officers must provide medical care to pretrial detainees. *Id*. The court continued: "The need to train officers how to differentiate between serious head injuries and intoxication, where those officers have been given the discretion to decide whether to provide medical treatment to victims of motor vehicle accidents, is so obvious, that the failure to do so could properly be characterized as deliberate indifference to constitutional rights." *Id.*

Hightower alleges that the City failed to train its correctional officers on how to prevent, identify, and intervene in assaultive conduct. As in *Reynolds*, the City knows to a moral certainty that its correctional officers will be required to respond to incidents in which cellmates threaten to assault or harm their cellmates, and pretrial detainees have a constitutional right to be free from inmate violence. The need to train correctional officers on how to respond to threats of violence where one cellmate explicitly threatens to harm another cellmate and those officers have been given the discretion to decide whether to remove one of the cellmates from the situation "is so obvious, that the failure to do so could properly be characterized as deliberate indifference to constitutional rights."

Accordingly, the Court denies the City's motion to dismiss the failure-or-inadequacy claim based on both the pattern of similar conduct theory and the single incident theory.

### IV.    Conclusion

For the foregoing reasons, the Court denies the City's motion.

An appropriate Order follows.